# In the United States Court of Federal Claims

**No. 26-1195C**
**Filed: October 21, 2026**
**Redacted Version Issued for Publication: November 4, 2026**[1]

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| **ALPHA OMEGA INTEGRATION LLC,** | * |
| | * |
| | * |
| **Protestor,** | * |
| | * |
| **v.** | * |
| | * |
| **UNITED STATES,** | * |
| | * |
| **Defendant.** | * |
| | * |
| * * * * * * * * * * * * * * * * * * | * |

**David S. Black**, **Gregory R. Hallmark**, and **Tanner N. Slaughter**, Holland & Knight LLP, Tysons, VA, for protestor.

**Blake W. Cowman**, Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington DC, for defendant. With him were **Douglas K. Mickle**, Acting Deputy Director, Commercial Litigation Branch; **Patricia M. McCarthy**, Director, Commercial Litigation Branch; and **Brett A. Shumate**, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC. Of counsel **Richard W. Postma, Jr.**, Deputy Chief Counsel, Acquisition & Fiscal Law Team, United States Citizenship and Immigration Services; **Eric Crane** and **Andrea Nwachukwu**, Associate Counsel, Commercial & Administrative Law Division, United States Citizenship and Immigration Services.

**O R D E R**

In the above captioned pre-award bid protest, protestor, Alpha Omega Integration LLC (Alpha Omega), challenges the United States Citizenship and Immigration Services' (USCIS or Agency) decision to eliminate protestor's quote from consideration under Request for Quotation No. 70SBUR26Q00000001 (the RFQ or the Solicitation) for "Outcome-Based Delivery and DevSecOps Services" (ODOS 3.1). One of the key issues in Alpha Omega's bid protest is whether protestor accessed an Amazon Web Services

[1] This Order was issued under seal on October 21, 2026. The parties were asked to propose redactions prior to public release of the Order. This Order is issued with some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

(AWS) account in violation of an RFQ instruction in paragraph 4.2.8(C) of the RFQ, as amended. The instruction in paragraph 4.2.8(C) of the RFQ, as amended, states:

> Once the Coding Challenge timeframe for completion has closed, there shall be no further commits to the source code, updates to the submission, or accessing the AWS account. Any commits, code updates, or access to the AWS account made by the Quoter after the Coding Challenge timeframe has closed will result in the disqualification of the Quoter.

(capitalization in original; emphases added). As discussed more fully below, this Order addresses the proper interpretation of the contested language in paragraph 4.2.8(C) of the RFQ, as amended, regarding "accessing the AWS account" after the Coding Challenge closed, as well as addresses protestor's multiple, sequential motions to supplement the Administrative Record, which have been opposed by defendant.

As background, on January 16, 2026, the USCIS issued the RFQ at issue in this protest, which describes a two-phase submission and three-factor evaluation process, and which includes the following table:

| Phase | Factor |
|---|---|
| Opt-In | Factor 1 – Price, including evidence of an adequate accounting system |
| 1 | Factor 2 – Coding Challenge |
| 1 | Factor 3 – Technical Demonstration |

With respect to the "Factor 2 – Coding Challenge," which is the factor relevant to the above captioned bid protest, and to this Order, the RFQ states in section 4.2.8:

> Quoters will be provided with a Coding Challenge upon verification of compliance of Factor 1 Price, that will require Quoters to create a web application based on a business case and accompanying user stories. Each Quoter will be provided the same Coding Challenge problem statement and detailed instructions on the expectations. The Coding Challenge will be sent via email. USCIS is a multi-cloud organization, and the Quoters are responsible for providing the environment and private GitHub[2] repository. The Quoter is expected to store the code in GitHub and deploy the application in Amazon Web Services (AWS). Real-time access to all environments and systems utilized for the coding challenge shall

[2] A Judge of the United States Court of Federal Claims has explained that "Github is a web-based platform that allows developers to store, manage, and share code." Intellibridge, LLC v. United States, 174 Fed. Cl. 793, 804 n.7 (2025) (citing GITHUB, INC., https://github.com), recons. denied, No. 24-1024C, 2025 WL 2231985 (Fed. Cl. Apr. 16, 2025).

> commence upon receipt of instructions and continue for 60 days post award.

(capitalization in original; footnote added). The RFQ also states that only ten participants were to be permitted to participate in the Coding Challenge and that "[q]uoters will be provided 7 calendar days to complete Factor 2." (alteration added). Upon completion of the Coding Challenge, offerors (which the RFQ calls "Quoters") were required to provide the USCIS with "[a]ccess to the URL for the working web application and credentials to access the application along with any other instructions as necessary." (alteration added). The RFQ also states that "[a]ccess to the GitHub URL that houses the solution to the Coding Challenge and private repositories shall be provided to the Government by sending an invite within GitHub" to the email addresses provided by the government. (alteration added).

Paragraph 4.2.8(C) of the RFQ, as initially issued on January 16, 2026, stated in full: "Once the coding challenge timeframe for completion has closed, there shall be no further commits to the source code or updates to the submission." On February 6, 2026, however, the USCIS issued Amendment 0004 to the RFQ to "[p]rovide answers to the questions and comments received in response to the ODOS 3.1 RFQ" and to provide updated RFQ instructions. (alteration added).[3] According to Amendment 0004, the USCIS received the following question (Question No. 10) concerning the "Factor 2 – Coding Challenge" instructions:

> The RFQ states that, "Once the coding challenge timeframe for completion has closed, there shall be no further commits to the source code or updates to the submission." Does the restriction extend to accessing the AWS account or making updates after the 14-day window apply to automated activities that are part of the CI/CD [Continuous Integration/Continuous Deployment/Delivery[4]] pipeline and continue to run autonomously and systematically?

(capitalization in original; alteration and footnote added). In response to Question No. 10 quoted immediately above, the USCIS issued the following response to all offerors: "Yes, the restriction extends to accessing the AWS account. No changes or updates will be accepted once the code/solution is delivered to the government, including any executions done autonomously and systematically." Accordingly, Amendment 0004 included the following revised paragraph 4.2.8(C) of the RFQ regarding the "Factor 2 – Coding Challenge:"

---

[3] The court notes that Amendment 0001, Amendment 0002, and Amendment 0003 to the RFQ were each issued for the purpose of extending the quote submission due date and do not appear to be relevant to the issues in this Order.

[4] The RFQ sometimes uses the acronym "CI/CD" to refer to "Continuous Integration/Continuous Deployment," and sometimes uses the acronym "CI/CD" to refer to "Continuous Integration/Continuous Delivery."

> Once the Coding Challenge timeframe for completion has closed, there shall be no further commits to the source code, updates to the submission, or accessing the AWS account. Any commits, code updates, or access to the AWS account made by the Quoter after the Coding Challenge timeframe has closed will result in the disqualification of the Quoter.

(capitalization in original; emphases added).[5]

On February 10, 2026, Alpha Omega submitted a business volume and pricing spreadsheet for the Opt-In Phase of the Solicitation. On March 7, 2026, Alpha Omega submitted its participant list for the Coding Challenge identifying ten individuals, including Mr. Jacob Bilbro,[6] to participate in the Coding Challenge. On March 10, 2026, at 3:01 P.M., the USCIS sent an email to Alpha Omega and five other offerors indicating the commencement of the Coding Challenge and stating that "the Government will require an invite within GitHub no later than seven (7) calendar days from the time of this email (Tuesday March 17, 2026 at 3:00pm ET)." According to protestor's bid protest complaint, Alpha Omega "participated in the Coding Challenge from March 10, 2026 to March 17, 2026." On March 17, 2026, Alpha Omega emailed the USCIS its Coding Challenge submittal, including the URLs and login credentials for the GitHub repository and the AWS Account upon which Alpha Omega's web application was deployed. (the AWS Account). In addition to Alpha Omega, five other offerors also participated in the Coding Challenge between March 10, 2026 and March 17, 2026, and also submitted their respective Coding Challenge submittals to the USCIS on March 17, 2026.

In early April 2026, the USCIS discovered a potential violation of the RFQ instructions by Alpha Omega, which is documented in an April 22, 2026 Memorandum to

---

[5] The court also notes that, between February 2026 and July 2026, the USCIS issued Amendment 0005, Amendment 0006, and Amendment 0007 to the RFQ. None of these amendments further altered the contested language in paragraph 4.2.8(C) of the RFQ concerning "accessing the AWS account" after the Coding Challenge closed and, therefore, do not appear to be relevant to the issues in this Order.

[6] According to protestor's bid protest complaint, Mr. Bilbro is an Alpha Omega employee "who was among the 10 Coding Challenge participants" for Alpha Omega. The Administrative Record currently before the court contains a statement from Mr. Bilbro, which was submitted by Alpha Omega to the USCIS with Alpha Omega's prior agency-level bid protest challenging Alpha Omega's disqualification from the competition, and which explains Mr. Bilbro's role as follows:

> I [Jacob Bilbro] am an employee of Alpha Omega Integration LLC ("Alpha Omega") and a member of its client services delivery team. I am well-versed in programming and cloud skills. When needed, I support Alpha Omega's governance and compliance activities for the cloud and IT [information technology] resources that are pertinent to my skills and customer projects.

(capitalization in original; alterations added).

File prepared by Contract Specialist Dianne Valiando and signed by Contracting Officer Celina Hemingway. The April 22, 2026 Memorandum to File states:

> Alpha Omega's account log showed considerable activity by Tom Jackson,[7] who was not on Alpha Omega's participant list, in the ODOS 3.1 Coding Challenge environment. It also showed nineteen (19) separate instances in which Tom Jackson was in the ODOS 3.1 Coding Challenge environment after the timeframe for completion had closed. Additionally, Alpha Omega's account log showed forty-four (44) separate instances in which Jacob Bilbro, who was on Alpha Omega's participant list and signed an NDA [non-disclosure agreement], was in the ODOS 3.1 Coding Challenge environment after the timeframe for completion had closed. As a result, USCIS has determined that Alpha Omega appears to have been non-compliant with material solicitation requirements and, if so, should be removed from the competition.

(capitalization in original; alteration and footnote added).

On the same day, April 22, 2026, Contract Specialist Valiando sent an email to Alpha Omega requesting clarification on Alpha Omega's alleged non-compliance with the RFQ's instructions. Contract Specialist Valiando's April 22, 2026 email stated that "the account log within AWS shows that one (1) individual [Tom Jackson] who was not included on the list of participants was active in AWS while the Coding Challenge was ongoing." (alteration added). Contract Specialist Valiando's April 22, 2026 email also stated that although "Jacob Bilbro was included on the Quoter's participant list and has a signed NDA on file, the AWS account log shows several 'Read-only' events triggered in AWS after the Coding Challenge concluded on 03/17/2026 at 3:00pm ET[.]" (capitalization in original; alteration added). Contract Specialist Valiando's April 22, 2026 email further stated: "[T]he AWS account log shows several 'Read-only' events triggered in AWS after the Coding Challenge concluded on 03/17/2026 at 3:00pm ET by Tom

---

7 According to protestor's bid protest complaint, Mr. Jackson is an Alpha Omega employee "who was not among the Coding Challenge participants" for Alpha Omega. The Administrative Record currently before the court also contains a statement from Mr. Jackson, which was submitted by Alpha Omega to the USCIS with Alpha Omega's prior agency-level bid protest challenging Alpha Omega's disqualification from the competition, and which explains Mr. Jackson's role as follows:

> I [Tom Jackson] am the Enterprise Cloud Administrator of Alpha Omega Integration LLC ("Alpha Omega"). In this role, I am a member of Alpha Omega's Infrastructure & Governance Support Team. I routinely conduct Alpha Omega's governance and compliance activities in connection with its IT systems, including activities required for compliance with the Department of War's Cybersecurity Maturity Model Certification ("CMMC") requirements.

(capitalization in original; alteration added).

Jackson, who was not included on the Quoter's participant list (Attachment 5) and did not have a signed NDA (Attachment 6) on file[.]" (capitalization in original; alterations added). Contract Specialist Valiando's April 22, 2026 email included screenshots from the AWS CloudTrail log,[8] which documented Mr. Bilbro's and Mr. Jackson's activity in the AWS Account on March 11, 2026, April 2, 2026, April 7, 2026, and April 13, 2026. Contract Specialist Valiando's April 22, 2026 email concluded:

> The Agency's initial assessment is that the participation of Tom Jackson, and the activity of Tom Jackson and Jacob Bilbro after the Coding Challenge timeframe for completion has closed makes Alpha Omega's quote non-compliant with material terms of the solicitation. If Alpha Omega disagrees with this assessment, please clarify how the participation of Tom Jackson, and the activity of Tom Jackson and Jacob Bilbro did not violate the requirements of the solicitation and the terms of the NDAs. Please confirm receipt of this email and provide a response no later than 5:00pm ET on Friday, April 24, 2026.

On April 24, 2026, Alpha Omega responded to the USCIS by letter, which stated:

> The Government requested clarification about read-only access attributed to Tom Jackson and Jacob Bilbro. Mr. Jackson did not participate in any way whatsoever in the coding challenge. Mr. Bilbro did participate in the challenge, as properly identified by Alpha Omega, and only during the allotted time of the coding challenge. The additional read-only accesses logged for Mr. Jackson and Mr. Bilbro reflect their roles as members of the Alpha Omega Infrastructure & Governance Support Team. This team routinely performs cost, usage, and security verifications on all cloud accounts. Additionally, to comply with the Department of Defense (War) Cybersecurity Maturity Model Certification (CMMC) Level 2 requirements, this team is required to audit our cloud infrastructure and ensure that protections are in place per our Governance, Risk and Compliance (GRC) requirements. As outlined in detail below, these periodic audits support Alpha Omega's required certification compliance by reviewing user privileges, security events, cost, and usage. These were the occurrences of read-only access that you inquired about.

---

[8] According to protestor's bid protest complaint:

> CloudTrail is an AWS service for operational and risk auditing, governance, and compliance of an AWS cloud account. Actions taken by a user, role, or AWS service are recorded in CloudTrail as log "events," and those events can include actions taken through the AWS Management Console, AWS Command Line Interface, AWS Software Development Kits, and AWS Application Programming Interfaces ("APIs").

(capitalization in original; internal reference omitted).

(capitalization and emphasis in original). Alpha Omega's April 24, 2026 letter continued:

> As a part of Department of Defense (War) (DOW) CMMC Level 2 requirements, we audit and secure all internal infrastructure against NIST [National Institute of Standards and Technology] 800-171 requirements.
>
> In February 2026, March 2026, and then in April 2026, we conducted a routine assessment of our internal tools, intranet, and cloud enclaves to gather user access, cost, and usage. We reported the assessment findings in the DOW SPRS [Supplier Performance Risk System] (https://www.sprs.csd.disa.mil/) system and confirmed our compliance with CMMC level 2 requirements.
>
> These were semi-automated activities using a combination of automated scripts (which run within 5 to 8 seconds) and manual verification (which takes 5 to 7 minutes). Activities associated with Tom Jackson were semi-automated scripts and at no time did Tom Jackson personally access 3.1 code challenge environment.
>
> The CloudTrail events cited by the Government (March and April) show that only Cost, Usage, and Security information were collected, as specifically evidenced by the read-only events, namely: GetCostandUsage, getCostForecast, GetUserList, DescribeUserPool, GetAccountPlanState, etc. Many other ancillary events such as GetAccountInformation and GetAccountColor are automated side effects of the governance information pull that the AWS website triggers without the user's control.
>
> Importantly, all these events are Read-Only and have no impact on the state of the coding challenge environment as delivered on March 17, 2026 at 3pm.

(all capitalization and emphasis in original; alterations added). Alpha Omega's April 24, 2026 letter also suggested that "[t]o the extent the Agency is concerned there may have been a perceived technical noncompliance, even in the demonstrable absence of any competitive impact, the Agency has authority to waive the perceived noncompliance." (alteration added).

After considering Alpha Omega's April 24, 2026 letter, the USCIS determined that Alpha Omega had violated paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004 in response to Question No. 10 and the answer the USCIS gave to Question No. 10. Therefore, the USCIS excluded Alpha Omega from further competition under the Solicitation. The USCIS's rationale for excluding Alpha Omega from further competition under the Solicitation is documented in a May 15, 2026 Memorandum to File prepared by Contract Specialist Valiando and signed by Contracting Officer Hemingway. The May 15, 2026 Memorandum to File stated:

> This memorandum documents the final resolution of two (2) potential violations of the Factor 2 Coding Challenge instructions and evaluation criteria by the Quoter, Alpha Omega Integration, LLC (Alpha Omega). First, the record shows the Quoter did not have more than the ten (10) participants allowed by the instructions. Second, the record shows the Quoter's participants accessed their Coding Challenge solution in AWS after the timeframe for commits, code updates and other access had closed.
>
> Based on the below considerations and consistent with the terms of the solicitation, the Contracting Officer has determined that Alpha Omega is non-compliant with material solicitation requirements and therefore is excluded from participating in the Factor 3 Technical Demonstration in support of the Outcome-based Delivery and Development, Security, Operations (DevSecOps) Services (ODOS) 3.1 DevSecOps and User Experience Design/User Interface Design (UXD/IxD) Services requirement. This approach neutralizes unfair competitive advantage and prejudice against other Quoters, and upholds the integrity of the procurement which dictates that an award be made to a responsive Quoter who follows solicitation requirements.

(capitalization and emphases in original). Under the heading "**Rationale for Removing Alpha Omega from the Competition**," (all capitalization and emphasis in original), the May 15, 2026 Memorandum to File stated in part:

> The Agency does not take any exception to the clarifying details provided for Tom Jackson during the allotted time of the Coding Challenge (03/10/2026 – 03/17/2026 at 3:00pm ET). Despite the fact that the solicitation limited the number of participants in the Factor 2 Coding Challenge to ten (10), and required all participants to sign NDAs, the solicitation was silent on who may perform routine administrative tasks in the underlying cloud account during the Factor 2 Coding Challenge timeframe. The solicitation also did not specify disqualification as a consequence should there be more than 10 participants. Since the actions of Tom Jackson were all administrative in nature and there were no commits to the source code or updates made to the submission, the Contracting Officer has determined that he did not "participate" in the coding challenge. Therefore, the Contracting Officer has determined that it's in the Government's best interest to waive any perceived non-compliance with respect to this matter in favor of the broader competition. If the perceived participation of Tom Jackson was the only issue identified with Alpha Omega's Factor 2 Coding Challenge submission, the Contracting Officer would have allowed Alpha Omega to remain in the competition and participate in the Factor 3 Technical Demonstration in support of the ODOS 3.1 DevSecOps and IXD/UxD Services requirement. However, the activity of Jacob Bilbro and Tom Jackson after the timeframe for completion has closed still remains an issue.

(capitalization and emphases in original). The May 15, 2026 Memorandum to File continued:

> Alpha Omega clearly admitted fault when stating that Tom Jackson and Jacob Bilbro accessed the AWS account after the Coding Challenge timeframe for completion had closed but contended that these individuals only performed routine governance, risk, and compliance responsibilities that Alpha Omega is required to perform and did not access the ODOS 3.1 Coding Challenge environment. Alpha Omega's acknowledgement of Tom Jackson's and Jacob Bilbro's activity confirms that a violation of the Factor 2 Coding Challenge requirements has taken place.
>
> Alpha Omega clarified that Jacob Bilbro accessed the AWS environment on 04/02/2026 and 04/07/2026 strictly in a read-only manner and that this administrative, read-only access was consistent with routine security and cost monitoring. However, this claim does not line up with all the actions that were taken as some of the recorded read-only events are not just about auditing; Jacob Bilbro was <u>looking at what the Government is doing in Alpha Omega's account</u>. If the read-only actions were solely taken for auditing purposes, some of the actions would not have been executed. The Agency also questions the legitimacy of the rationale that Alpha Omega provided regarding its audit requirements, specifically with respect to the frequency. If Alpha Omega conducted routine assessments of their internal tools, intranet, and cloud enclaves to gather user access, cost, and usage in February 2026, March 2026, and April 2026, the Government finds it very unlikely that NIST 800-171 requires Alpha Omega to audit and secure all internal infrastructure approximately every five (5) days as they claimed Jacob Bilbro did on 04/02/2026 and 04/07/2026, and Tom Jackson did on 04/13/2026. According to Google, NIST 800-171 compliance requires organizations to audit and secure internal infrastructure at least annually, though high-risk environments often necessitate more frequent checks. While the Government does not question whether Alpha Omega has a high-risk environment, the Agency does take exception to the excessive frequency.

(capitalization and emphasis in original). The May 15, 2026 Memorandum to File also stated:

> Alpha Omega requested for any perceived non-compliance to be waived in favor of the broader competition. However, the solicitation was explicit that "[a]ny . . . access to the AWS account made by the Quoter after the Coding Challenge timeframe has closed will result in the disqualification of the Quoter.["] This disqualification provision was not limited to any particular type of access, and did not include an exception for read-only access.

> The solicitation was intentionally written and structured so that paragraph C. would stand on its own , [sic] and would be referenced if a violation took place and the Contracting Officer needed to disqualify a Quoter from the competition. If Alpha Omega had any questions regarding the language in paragraph C., the Quoter had every opportunity to submit a question during the solicitation phase. No questions regarding paragraph C. were submitted by Alpha Omega, or any other Quoter.[9] Therefore, the Government has every reason to believe that Alpha Omega not only understood that it needed to comply with this solicitation requirement, but that they had no concerns about it. Further, through clarifications with similarly situated Quoters, the Government has received confirmation that the language in paragraph C. was abundantly clear and not ambiguous.
>
> USCIS cannot consider this request in good faith as there were other Quoters that did not access their AWS account after the Coding Challenge timeframe for completion had closed. Alpha Omega's misinterpretation or disregard of material solicitation requirements cannot be excused as doing so would prejudice other Quoters and deviate from the solicitation. Alpha Omega could gain several significant advantages during the Factor 3 Technical Demonstration by using the data obtained through their unauthorized read-only access. Even without the ability to change code, read-only access within the AWS environment allows Alpha Omega to verify that their code actually ran as expected, review logs or parameter outputs to understand why errors occurred, inspect resource configurations, and possibly even retrieve sensitive metadata that can be used as proof of success. Alpha Omega's access to this information after the Coding Challenge timeframe for completion has closed bypassed the lockdown period intended to ensure all Quoters are evaluated based on what they knew and did within the allocated timeframe. Additionally, Alpha Omega's read-only access prejudices the other Quoters as Alpha Omega now has an unfair "open-book" advantage for a technical demonstration that should ideally be a test of their real-time performance and recollection of the Factor 2 Coding Challenge. Therefore, the Contracting Officer has determined that Alpha Omega is non-compliant with material RFQ requirements and therefore excluded from participating in the Factor 3 Technical Demonstration.

[9] The court notes that the statement in the May 15, 2026 Memorandum to File that "[n]o questions regarding paragraph C. were submitted by Alpha Omega, or any other Quoter," (alteration added), is confusing because, as discussed above, another offeror, not protestor, did submit Question No. 10 regarding the language in paragraph 4.2.8(C) of the RFQ, which the USCIS answered in Amendment 0004. This apparent misstatement in the May 15, 2026 Memorandum to File, however, does not change the plain meaning of paragraph 4.2.8(C) of the RFQ or the court's analysis of paragraph 4.2.8(C) of the RFQ.

(second and third alteration and footnote added; capitalization and omission in original).[10]

On the same day, May 15, 2026, Contracting Officer Hemingway sent a separate letter to Alpha Omega indicating that protestor had been disqualified from further competition under the Solicitation. Contracting Officer Hemingway's May 15, 2026 letter stated in part:

> The AWS account log associated with your Factor 2 – Coding Challenge submission shows several "Read-only" events triggered in AWS by Jacob Bilbro and Tom Jackson after the Coding Challenge concluded on 03/17/2026 at 3:00pm ET. The Agency has reviewed your response to its Clarification email, which admitted that these individuals accessed the AWS account after the Coding Challenge timeframe for completion had closed to perform routine governance, risk, and compliance responsibilities.
>
> In accordance with RFQ 70SBUR26Q00000001 Solicitation Addendum to FAR 52.212-1 Instructions to Offerors – Commercial Products and Commercial Services, paragraph 4.2.8, any commits, code updates, or access to the AWS account made by the Quoter after the Coding Challenge timeframe has closed will result in the disqualification of the Quoter. This disqualification provision was not limited to any particular type of access, and did not include an exception for read-only access.

(capitalization in original). Contracting Officer Hemingway's May 15, 2026 letter also stated:

> While Alpha Omega requested for any perceived non-compliance to be waived in favor of the broader competition, doing so would prejudice other Quoters and deviate from the solicitation.

---

[10] The court notes that the USCIS also disqualified another, different offeror, [redacted], from competition under the Solicitation for similar reasons as those for which Alpha Omega was eliminated. According to a separate May 15, 2026 Memorandum to File related to [redacted], the USCIS found:

> [redacted] clearly admitted fault when stating that [redacted] accessed the AWS account after the Coding Challenge timeframe for completion had closed but contended that this individual only performed administrative responsibilities and did not access the subsystem portion of the AWS environment containing code from the Coding Challenge or configurations involved in the Coding Challenge after 03/17/2026. [redacted]'s acknowledgement of [redacted] activity confirms that a violation of the Factor 2 Coding Challenge requirements has taken place.

(capitalization in original; alterations added).

> Alpha Omega could gain several significant advantages during the Factor 3 Technical Demonstration by using the data obtained through their unauthorized read-only access. Even without the ability to change code, read-only access within the AWS environment allows Alpha Omega to verify that their code actually ran as expected, review logs or parameter outputs to understand why errors occurred, inspect resource configurations, and possibly even retrieve sensitive metadata that can be used as proof of success. Alpha Omega's access to this information after the Coding Challenge timeframe for completion has closed bypassed the lockdown period intended to ensure all Quoters are evaluated based on what they knew and did within the allocated timeframe. Additionally, Alpha Omega's read-only access prejudices the other Quoters as Alpha Omega now has an unfair "open-book" advantage for a technical demonstration that should ideally be a test of their real-time performance and recollection of the Factor 2 Coding Challenge. Therefore, the Contracting Officer has determined that Alpha Omega is non-compliant with material RFQ requirements and therefore excluded from participating in the Factor 3 Technical Demonstration.

(capitalization in original).

According to protestor's complaint filed in the United States Court of Federal Claims: "On May 26, 2026, Alpha Omega filed an agency-level bid protest with USCIS challenging the Agency's exclusion of Alpha Omega," and, "[o]n June 30, 2026, the USCIS Deputy Head of Contracting Activity, Elieser Roque, issued a decision denying Alpha Omega's agency-level protest." (alteration added). The above captioned bid protest in the United States Court of Federal Claims followed. In its one-count complaint in the United States Court of Federal Claims, protestor alleges that "[t]he Agency's decision to disqualify Alpha Omega from the competition for having 'accessed the AWS account' was arbitrary, capricious, an abuse of discretion, and not in accordance with law." (alteration added). Protestor argues:

> The Agency disqualified Alpha Omega based on an interpretation of the Solicitation that is overbroad and unreasonable—that Alpha Omega's retrieval of noncompetitively useful account information in support of routine IT governance and compliance activities captured in the CloudTrail log constitute impermissible "accessing the AWS account" for purposes of the Coding Challenge instructions at § 4.2.8(C) of the RFQ. It is unreasonable and inconsistent with the plain language of the Solicitation <u>when harmonized within its context regarding the Factor 2 Coding Challenge</u> to interpret the restriction on access to the AWS account as prohibiting quoters from obtaining non-competitively useful <u>**billing- and security-related information**</u> regarding cost, usage, and user access.

(all capitalization and emphasis in original). Protestor also asserts that, "even if Alpha Omega's activities could reasonably be construed as prohibited 'accessing the AWS

account,' the Agency's rationale for not waiving this 'non-compliance' was arbitrary and capricious and an abuse of its discretion."

After the initial hearing in the above captioned bid protest, this court issued an Order on August 24, 2026, which instructed defendant to confer with protestor and to file the Administrative Record. On September 11, 2026, defendant filed the Administrative Record. After defendant filed the Administrative Record, protestor filed multiple, sequential motions to supplement the Administrative Record, which could have been raised prior to defendant filing the Administrative Record.

In protestor's first, September 22, 2026 motion to supplement the Administrative Record, protestor states:

> AOI [Alpha Omega Integration LLC] seeks to complete the Administrative Record with a limited capture—screenshots with explanatory factual statements—reflecting the contents of the AWS Account, which were before the Agency at the time it made its decision to eliminate AOI from competition. In the alternative, AOI seeks to supplement the Administrative Record with the same limited capture of the AWS Account, because the exclusion of such information from the Administrative Record would frustrate effective judicial review of AOI's claims, including its challenge to the Agency's assertions of fact concerning the information that AOI obtained by virtue of Mr. Bilbro's and Mr. Jackson's activities.
>
> AOI also seeks to supplement the Administrative Record with a video recording (the "Video") prepared by an AOI staff member, Jacob Bilbro (the AOI employee whose activities captured in the CloudTrail application were the basis of Defendant's decision to disqualify AOI), showing an account in the AWS environment that is separate from the AWS Account at the heart of the dispute in this case (the "Separate Account"). The Video shows Mr. Bilbro logging into the Separate Account and navigating to certain services within AWS, and showing CloudTrail records of those activities, to demonstrate that the AWS account activities for which the Agency disqualified AOI did not provide AOI the information that the Agency's decision documentation identified. The Separate Account is the same as the AWS Account that was before the Agency in all respects relating to the functions and actions demonstrated by Mr. Bilbro. In addition to the Video, AOI seeks to supplement the Administrative Record with a declaration prepared by Mr. Bilbro authenticating and explaining the Video and establishing his familiarity with AWS cloud services. The exclusion of this information, too, from the Administrative Record would frustrate effective judicial review of AOI's claims, including regarding the Agency's assertions about the information AOI obtained.

(capitalization in original; alteration added).

Subsequently, protestor filed a second, September 24, 2026 motion to supplement the Administrative Record, which states: "AOI seeks to supplement the Administrative Record with AOI's current ODOS task order, its modifications, and the Chief Information Officer – Solutions and Partners 3 ('CIO-SP3') Indefinite Delivery Indefinite Quantity ('IDIQ') contract under which the ODOS task order was issued." (capitalization in original; footnotes omitted). In protestor's second, September 24, 2026 motion to supplement the Administrative Record, protestor argues that protestor's incumbent, current ODOS task order, the modifications thereto, and the underlying CIO-SP3 IDIQ contract "are highly relevant to AOI's cybersecurity responsibilities that were in place when the [ODOS 3.1] Solicitation was issued and procurement was ongoing." (alteration added; footnote omitted). Protestor also argues:

> The cybersecurity requirements in AOI's CIO-SP3 contract and ODOS task order, which are common to contracts with the U.S. Department of Homeland Security, are directly relevant to the adjudication of the interpretation of the Solicitation's provision restricting post-Coding Challenge access to the AWS account and whether the Agency's minor informality analysis was an abuse of discretion. This information addresses whether AOI and other contractors with DHS [Department of Homeland Security] were required to review the list of authorized users to confirm it is accurate and current. This information is not currently in the Administrative Record, and its absence will frustrate the Court's ability to interpret the Solicitation provisions at issue in this protest and review the reasonableness of the Agency's determination that AOI's activities in the AWS account were not a minor informality.

(capitalization in original; alteration added).

On September 30, 2026, the court issued an Order stating that the materials protestor seeks to make part of the Administrative Record in the above captioned bid protest appear to be related to what kind of information the Alpha Omega employees allegedly accessed in the AWS Account after the Coding Challenge closed on March 17, 2026, and why, according to protestor, the Alpha Omega employees allegedly accessed such information without violating the RFQ's instructions regarding the Coding Challenge. This court's September 30, 2026 Order instructed the parties to file simultaneous submissions addressing the legal meaning of the contested language in paragraph 4.2.8(C) of the RFQ regarding "accessing the AWS account" after the Coding Challenge closed. This court's September 30, 2026 Order also instructed the parties to address whether there is any indication in the RFQ language that an offeror's non-compliance with the contested language in paragraph 4.2.8(C) of the RFQ regarding "accessing the AWS account" could be waived by the agency and if the contested language in paragraph 4.2.8(C) of the RFQ was material.

On October 5, 2026, protestor and defendant each filed their respective, simultaneous briefs in response to the court's September 30, 2026 Order, and, on October 9, 2026, protestor and defendant each filed their response briefs. In protestor's

initial brief, protestor argues that "the Solicitation cannot reasonably be interpreted as prohibiting quoters from merely logging into the AWS Account to retrieve non-competitively useful account information in support of routine IT governance and compliance activities." According to protestor's initial brief:

> When the Agency issued Amendment 0004 to the Solicitation, which added the prohibition against "accessing the AWS account" following the conclusion of the Coding Challenge, the unambiguous meaning of that provision was not to prevent any and all logging into the account, but rather to prohibit the kind of access which enabled "commits to the source code" or "updates to the submission," consistent with circumstances by which the Agency added that prohibition to the Solicitation and the law of solicitation interpretation.

(internal reference omitted). Protestor argues that the RFQ's prohibition on "accessing the AWS account" merely prohibits "access to make changes to the quoter's Coding Challenge submission." Defendant, however, argues in its initial brief: "The solicitation is clear that <u>any</u> access results in disqualification without any qualifiers; no text of the provision indicates that 'any access to the AWS account' actually means some subset of the AWS account, as Alpha Omega alleges." (emphasis in original). With respect to the meaning of the term "access," defendant asserts in its initial brief:

> In information technology settings, "access" is defined as, "to open or load (a computer file, an Internet site, etc.)." <u>Access</u>, Merriam Webster (Oct. 5, 2026), https://www.merriam-webster.com/dictionary/access; <u>see also</u> <u>Access</u>, Cambridge Dictionary (Oct. 5, 2026), https://dictionary.cambridge.org/us/dictionary/english/access ("to open a computer file, a website, etc. in order to look at or change information in it."). The solicitation did not define the term, but these dictionary definitions are representative of how the term is used in programming and information technology contexts such as the solicitation.

Defendant, therefore, argues that "the prohibition on 'access to the AWS account' means that, after the coding challenge concluded on March 17, 2026, quoters were prohibited from <u>any</u> opening or loading of the AWS account—the account on which their coding challenge application was deployed." (emphasis in original).

In its response brief, protestor argues that defendant's interpretation of the RFQ language "depends on analyzing the reference to 'accessing the AWS account' <u>**in isolation**</u>, by observing that no 'qualifiers' are present." (all emphasis in original; internal reference omitted). Protestor continues in its response brief:

> The prohibition in question is not simply against "accessing," but rather against "commits to the source code, updates to the submission, or accessing the AWS account." In a three-part list, two of the items relate to the same thing: making changes to the program developed during the

> Coding Challenge. From a "plain language" standpoint, Defendant has no explanation for why the third item of the list would shift suddenly from a focus on the programming product and to a broader restriction against simply logging into an account.

Protestor objects to defendant's proposed dictionary definitions for the term "access" because, according to protestor, "an AWS account is neither a computer file, nor a website, but is rather a cloud service platform which enables a user to perform a number of discrete tasks, run different programs, or enter various environments."

In its initial brief, protestor also argues that "the meaning of the prohibition against 'accessing the AWS account' depends upon its context, that is, upon the words around it." Protestor further argues in its initial brief, with respect to the sentence in paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, that states "[o]nce the Coding Challenge timeframe for completion has closed, there shall be no further commits to the source code, updates to the submission, or accessing the AWS account," (alteration added), as follows:

> It would be incongruous to understand the third item, "accessing the AWS account," not in relation to changes to the quoter's Coding Challenge submission, but as imposing an entirely different category of prohibition—mere logging into the AWS account. The requirement to understand a solicitation's terms in their context dictates that this third item bear some resemblance to the first two; in which case, the more natural reading of "accessing the AWS account" in context refers to using such access to make changes—whether commits, updates, or other kinds of changes not expressly identified by the Solicitation previously.

Protestor similarly argues in its initial brief that "interpreting 'accessing the AWS account' to prohibit any and all logging-in would completely swallow the separate prohibition on 'updates to the submission,' since no quoter could make such update without violating the broader prohibition on logging into the account." Defendant, however, responds to protestor's argument by asserting:

> A quoter could update the submission without logging into the account by using automatic updates that run autonomously and systemically. Such a case was clearly on USCIS's mind when drafting the requirement, since it was one of two questions set forth in question 10 discussed above. Thus, all three requirements work together towards the end of protecting the integrity of USCIS's evaluation and ensuring equal treatment of quoters. Therefore, the plain meaning of the solicitation presents no superfluity problem.

Protestor also argues in its initial brief that "[t]he 'plain language' of the Solicitation here does not just include the prohibition against 'accessing the AWS account' in a vacuum, it also includes the text of Question 10 and the Agency's answer thereto,"

(alteration added), which, according to protestor, "are both couched in terms of making 'changes' and 'updates' to the Coding Challenge submission . . . ." (omission added). According to defendant, however:

> USCIS's answer definitively provides two separate and distinct responses. First, "[y]es, the restriction extends to accessing the AWS account." Like the solicitation language itself, this response contains no qualifiers that would limit the restriction on "access." Second, USCIS answered, "[n]o changes or updates will be accepted once the code/solution is delivered to the government, including any executions done autonomously and systematically." This second answer clearly applies to the latter half of the quoter's question and neither implies or suggests that "accessing the AWS account" would be limited to the coding challenge environment.

(alterations in original; internal references omitted). Protestor responds:

> There is no indication either in Question 10, or in the Agency's answer, that Question 10 was actually two questions meriting two answers. Rather, to the contrary: the Agency gave one answer which clarified what the questioner was concerned about, namely, whether they could enable "automated activities" making changes to the Coding Challenge product notwithstanding the stated prohibition on "commits" or "updates."

Protestor, therefore, characterizes the USCIS's answer to Question No. 10 as "an exercise in gap-filling, in expanding the degree of prohibited behavior under the Factor 2 prohibition, not in altering that prohibition in kind." Defendant, however, responds: "References to 'accessing the AWS account' and 'automated activities' clearly mean different things." Defendant continues: "USCIS addressed both parts of question 10 in its amendment, making clear that 'Any commits, code updates, or access to the AWS account made by the Quoter after the Coding Challenge timeframe has closed will result in the disqualification of the Quoter.'" (emphasis in defendant's brief).

Moreover, protestor argues in its initial brief that "[b]ecause AOI's activities after the Coding Challenge were key to its continued compliance with its cybersecurity requirements, an interpretation of the Solicitation which requires AOI to abdicate its responsibilities under government cybersecurity programs by preventing AOI from accessing the required user information would be an absurd result." (alteration added). In its response brief, defendant argues:

> Alpha Omega identifies difficulties in complying with the restriction, not evidence the plain language of the solicitation means something else. And if the solicitation made compliance with billing or cybersecurity requirements impossible, such challenges were required before bids were due. See Blue & Gold [Fleet, L.P. v. United States], 492 F.3d [1308,] 1313 [(Fed. Cir. 2007)].

(alterations added; internal reference omitted).

In addition, protestor argues in its initial brief that "the Agency's own behavior during this procurement indicates that the interpretation of the 'accessing the AWS account' prohibition is not reasonable" because, according to protestor, "the Agency reviewed, and waived, the alleged non-compliance of the quoter [redacted], which had failed to provide access to the AWS account in which [redacted]'s program submission was deployed."[11] Defendant, however, argues in its response brief:

> Alpha Omega takes issue with USCIS's failure to exclude another offeror, [redacted], for its violation of a separate solicitation requirement: the requirement to provide login credentials for USCIS to access AWS. This is irrelevant to the question at hand. USCIS's decision whether to exclude an offeror for failing to provide login credentials cannot change the meaning of "any . . . access to the AWS account," particularly where USCIS was analyzing a <u>different</u> solicitation requirement.

(emphasis and omission in original; internal references omitted).

In order to determine the relevance of protestor's multiple, sequential motions to supplement the Administrative Record, the court first interprets the RFQ to determine the meaning of the RFQ's prohibition on "accessing the AWS account." The interpretation of a solicitation is a question of law. <u>See</u> <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345, 1353 (Fed. Cir. 2004); <u>see</u> <u>also</u> <u>CWS FMTI JV LLC v. United States</u>, 180 Fed.

[11] According to a separate May 15, 2026 Memorandum to File related to another offeror, [redacted], the USCIS discovered that [redacted] had "provided a list of usernames and passwords for the various services used but failed to provide a location of where those services can be accessed." After requesting clarifications from [redacted], the USCIS ultimately decided to waive [redacted]'s non-compliance and documented its rationale as follows:

> The Vendor did provide the required Access to the URL and credentials for the working web application, which were required by the solicitation. Further, in accordance with Section 4.2.5 of the solicitation under the Addendum to FAR 52.212-1, the resolution of clerical mistakes or the correction of minor informalities or irregularities does not constitute a quotation revision. Because the solicitation equally allowed for such resolution for all Quoters, there is no possible prejudice to any other Quoter. In favor of the broader competition, the Contracting Officer has determined that it's in the Government's best interest to accept the new information that was obtained via clarifications as the location of the various application links were a minor informality/irregularity. This will allow the Quoter to remain in the competition and participate in the Factor 3 Technical Demonstration in support of the ODOS 3.1 DevSecOps and IXD/UxD Services requirement.

(all capitalization in original).

Cl. 359, 364 (2026); Am. Tech Sols., LLC v. United States, 178 Fed. Cl. 73, 82 (2025) ("The correct interpretation of a solicitation is a question of law."); Allicent Tech., LLC v. United States, 166 Fed. Cl. 77, 145 (2023), recons. denied, No. 22-1380C, 2023 WL 4287196 (Fed. Cl. June 30, 2023); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 736 (2017) (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353); Greenland Contractors I/S v. United States, 131 Fed. Cl. 216, 227 (2017) (citing CBY Design Builders v. United States, 105 Fed. Cl. 303, 327 (2012)). Regarding the interpretation of the solicitation language, the United States Court of Appeals for the Federal Circuit has stated:

> We begin with the plain language of the document. The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation. If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them. Finally, we must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.

Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (emphasis in original) (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353); see also Gen. Dynamics Info. Tech., Inc. v. United States, No. 26-292C, 2026 WL 2491476, at *14 (Fed. Cl. Aug. 22, 2026); Chugach Logistics & Facility Servs. JV, LLC v. United States, 182 Fed. Cl. 794, 809 (2026); CWS FMTI JV LLC v. United States, 180 Fed. Cl. at 364; Am. Tech Sols., LLC v. United States, 178 Fed. Cl. at 82; AccelGov, LLC v. United States, 170 Fed. Cl. 508, 516 (2024); Allicent Tech., LLC v. United States, 166 Fed. Cl. at 145; ARxIUM, Inc. v. United States, 136 Fed. Cl. 188, 198 (2018) ("When interpreting a solicitation, the document must be considered as a whole and interpreted in 'a manner that harmonizes and gives reasonable meaning to all of its provisions.'" (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353)). Further, a "solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation," and "[i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them." Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353 (alteration added) (quoting Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also Safeguard Base Operations, LLC v. United States, 989 F.3d 1326, 1344 (Fed. Cir. 2021). "Moreover, when a procuring agency circulates its answers to a Question & Answer session as an attachment to an amendment of the solicitation, those answers must be interpreted as part of the solicitation." SOFITC3, LLC v. United States, 178 Fed. Cl. 194, 209 (2025) (citing Per Aarsleff A/S v. United States, 829 F.3d at 1311); see also Noblis MSD, LLC v. United States, 180 Fed. Cl. 667, 690 (2026) ("At a minimum, such Q&As [Questions and Answers] put offerors on notice of the government's reading of the Solicitation." (alteration added)).

As indicated above, paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, states:

> Once the Coding Challenge timeframe for completion has closed, there shall be no further commits to the source code, updates to the submission, or accessing the AWS account. Any commits, code updates, or access to the AWS account made by the Quoter after the Coding Challenge timeframe has closed will result in the disqualification of the Quoter.

(capitalization in original; emphases added). The plain language of paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, unambiguously establishes a categorical prohibition on "accessing the AWS account" after the Coding Challenge closed on March 17, 2026. The use of the disjunctive "or" in the first sentence of paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, identifies three, separate categories of conduct that are each prohibited after the close of the Coding Challenge on March 17, 2026: "there shall be no further [1] commits to the source code, [2] updates to the submission, or [3] accessing the AWS account." (alterations added). See also SkinMedica, Inc. v. Histogen Inc., 727 F.3d 1187, 1199 (Fed. Cir. 2013) ("The disjunctive 'or' plainly designates that a series describes alternatives."). The second sentence of paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, reinforces those three prohibitions by providing that "[a]ny commits, code updates, or access to the AWS account made by the Quoter" after the Coding Challenge closed on March 17, 2026 "will result in the disqualification of the Quoter." (alteration added). The United States Supreme Court has recognized that the word "any" has "expansive meaning." See United States v. Gonzales, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting Webster's Third New Dictionary 97 (1976)). The United States Supreme Court has further stated that when a modifier, like the word "any," precedes or follows an uninterrupted list of parallel construction, it modifies each word or phrase in that list. See Facebook, Inc. v. Duguid, 592 U.S. 395, 402-03 (2021). Therefore, paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, prohibits "any" access to the AWS Account of whatever kind, including "Read-only access," after the Coding Challenge closed on March 17, 2026, rather than merely prohibiting only "the kind of access which enabled 'commits to the source code' or 'updates to the submission,'" as suggested by protestor. Moreover, in the context of the RFQ at issue in Alpha Omega's bid protest for information-technology related services, the court agrees with defendant that "access," as used in paragraph 4.2.8(C) of the RFQ, refers to opening or loading the AWS Account. See Access, Merriam-Webster.com Dictionary ("access" means "to open or load (a computer file, an Internet site, etc.)"), https://www.merriam-webster.com/dictionary/access (last visited Nov. 4, 2026); see also Access, Cambridge Dictionary ("access" means "to open a computer file, a website, etc. in order to look at or change information in it"), https://dictionary.cambridge.org/us/dictionary/english/access (last visited Nov. 4, 2026).[12] The plain language of paragraph 4.2.8(C) of the RFQ is fatal to protestor's argument that the RFQ's prohibition on "accessing the AWS account" merely prohibits "access to make changes to the quoter's Coding Challenge submission."

Protestor's reliance on Question No. 10, and the USCIS's answer thereto, to argue that paragraph 4.2.8(C) of the RFQ merely prohibits "access to make changes to the

[12] The court also notes that protestor did not propose a dictionary definition for the term "access" as used in paragraph 4.2.8(C) of the RFQ.

quoter's Coding Challenge submission" also is unpersuasive. As indicated above, the original version of paragraph 4.2.8(C) of the RFQ, as initially issued on January 16, 2026, stated in full: "Once the coding challenge timeframe for completion has closed, there shall be no further commits to the source code or updates to the submission." Also as indicated above, during the questions and answers period for the Solicitation, the USCIS received Question No. 10, which stated:

> The RFQ states that, "Once the coding challenge timeframe for completion has closed, there shall be no further commits to the source code or updates to the submission." Does the restriction extend to accessing the AWS account or making updates after the 14-day window apply to automated activities that are part of the CI/CD pipeline and continue to run autonomously and systematically?

(capitalization in original). The USCIS's answer to Question No. 10 clarified that "the restriction extends to accessing the AWS account," without any further qualification. The USCIS's answer to Question No. 10 also clarified that "[n]o changes or updates will be accepted once the code/solution is delivered to the government, including any executions done autonomously and systematically." (alteration added). Although protestor and defendant dispute whether the USCIS's answer to Question No. 10 should be considered "two separate and distinct responses," as suggested by defendant, or a single answer "couched in terms of making 'changes' and 'updates' to the Coding Challenge submission," as suggested by protestor, the plain language of the revised paragraph 4.2.8(C) of the RFQ in Amendment 0004 resolves that dispute. As discussed above, simultaneously with issuing its answer to Question No. 10, the USCIS included a revised paragraph 4.2.8(C) of the RFQ in Amendment 0004 to state, explicitly, that "[a]ny commits, code updates, or access to the AWS account made by the Quoter after the Coding Challenge timeframe has closed will result in the disqualification of the Quoter." (alteration added). Therefore, the revised paragraph 4.2.8(C) of the RFQ in Amendment 0004 addressed the offeror's concern in Question No. 10 as to whether "the restriction extend[s] to accessing the AWS account." (alteration added). In addition, by adding the word "any" before the stated prohibitions on "commits, code updates, or access to the AWS account," the revised language in paragraph 4.2.8(C) of the RFQ in Amendment 0004, which was sent to all offerors, also addressed the offeror's concern in Question No. 10 regarding commits or updates to source code "done autonomously and systematically." Notably, the USCIS's answer to Question No. 10 should have put protestor on notice that the USCIS interpreted paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, to prohibit any and all access, without any limitations, to the AWS Account after the close of the Coding Challenge on March 17, 2026. See Noblis MSD, LLC v. United States, 180 Fed. Cl. at 690. Therefore, neither the plain language of paragraph 4.2.8(C) of the RFQ, nor the USCIS's answer to Question No. 10, support protestor's position that the RFQ's prohibition on "accessing the AWS account" merely prohibits "access to make changes to the quoter's Coding Challenge submission."

The court also has reviewed protestor's other arguments to try to support its interpretation of the RFQ's prohibition on "accessing the AWS account," but finds them to

be unpersuasive in light of the plain and unambiguous language of paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004. See Per Aarsleff A/S v. United States, 829 F.3d at 1309 ("If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning[.]" (emphasis in original; alteration added) (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353)). Protestor argues that "the meaning of the prohibition against 'accessing the AWS account' depends upon its context, that is, upon the words around it," however, in the case currently under review, the noscitur a sociis canon[13] should not be invoked to impart ambiguity into an unambiguous solicitation provision. See Russell Motor Car Co. v. United States, 261 U.S. 514, 520 (1923) (rejecting plaintiffs' noscitur a sociis argument because "the meaning of the words considered severally is not in doubt, and the rule is invoked not to remove an obscurity, but to import one"). Although protestor argues that the USCIS's interpretation would produce an "absurd result," paragraph 4.2.8(C) of the RFQ, as amended, explicitly warned all offerors, including protestor, that any access to the AWS account after the Coding Challenge closed on March 17, 2026 "will result in the disqualification of the Quoter." See Ingham Reg'l Med. Ctr. v. United States, 182 Fed. Cl. 1, 18 (2026) ("Plaintiffs' 'absurd results' argument is unpersuasive where the separate exclusions and their results were disclosed in the plain language of the contract and plaintiffs knowingly accepted these results."). Protestor submitted its Coding Challenge submittal to the USCIS after the issuance of Amendment 0004 with the revised language in paragraph 4.2.8(C) prohibiting any access to the AWS Account. See id. The court also notes that although protestor and another offeror were disqualified from further competition under the Solicitation for allegedly "accessing the AWS account" after the Coding Challenge closed on March 17, 2026, the Administrative Record currently before the court suggests that four other offerors were able to comply with the prohibition on "accessing the AWS account" after the Coding Challenge closed on March 17, 2026. In addition, the USCIS's decision to waive [redacted]'s non-compliance with a different solicitation requirement, the requirement that offerors provide the URL and login credentials for the USCIS to access the AWS account, does not appear to be relevant to the interpretation of the plain language of the RFQ's prohibition on "accessing the AWS account," or relevant to the actions taken by Alpha Omega in violation of paragraph 4.2.8(C) of the RFQ.

As indicated above, this court's September 30, 2026 Order also instructed the parties to address whether there is any indication in the RFQ language that an offeror's non-compliance with the contested language in paragraph 4.2.8(C) of the RFQ regarding "accessing the AWS account" could be waived by the agency and if the contested language in paragraph 4.2.8(C) of the RFQ was material. In protestor's initial brief, protestor asserts:

> The RFQ provides authorization to the Agency to waive AOI's perceived "noncompliance." AOI contends that, to the extent its actions recorded in

[13] The United States Supreme Court has explained the noscitur a sociis canon as follows: "[T]he canon of noscitur a sociis teaches that a word is 'given more precise content by the neighboring words with which it is associated.'" Fischer v. United States, 603 U.S. 480, 487 (2024) (alteration added) (quoting United States v. Williams, 553 U.S. 285, 294 (2008)).

> the CloudTrail logs can be seen as "accessing the AWS account" at all, such non-compliance was a waivable informality or minor irregularity. The RFQ plainly grants the Agency authority to waive informalities and minor irregularities. The RFQ contains the Federal Acquisition Regulation ("FAR") clause 52.212-1, which, in its paragraph (d), states: "The Government may . . . waive informalities and minor irregularities in offers received."[14] This language conclusively establishes that the Solicitation provides for the Agency's waiver of informalities and minor irregularities in offers received.

(capitalization and omission in original; footnote added; internal reference omitted). Protestor also contends that "the question of the Agency's authority to waive the prohibition on 'accessing the AWS account' is not limited to whether the Solicitation provision in question is material (i.e., whether 'the language is material')." Protestor, instead, argues that "the critical question in this case" is "whether the [sic] AOI's specific actions constituted a material non-compliance with the Solicitation." (alteration added).[15] Protestor asserts:

> The Agency thus did not rely on a simple finding of non-compliance with a non-waivable Solicitation requirement in deciding to disqualify AOI. Rather, the prevailing sentiment of the disqualification memorandum is that the prohibition on "accessing the AWS account" was waivable but that AOI had actually obtained a competitive advantage by virtue of its activities recorded in the CloudTrail logs and that its disqualification was therefore necessary to preserve the integrity of the competition. That is, the Agency examined whether the "non-compliance" was material, concluded that it was, and decided not to waive the "non-compliance" for that reason. AOI's protest challenges the Agency's finding of materiality.

---

[14] The full language from FAR 52.212-1(d), as stated in the RFQ, is as follows:

> (d) Contract award (not applicable to Invitation for Bids). The Government intends to evaluate offers and award a contract without discussions with Offerors. Therefore, the Offeror's initial offer should contain the Offeror's best terms. However, the Government reserves the right to conduct discussions, if necessary. The Government may reject any or all offers if such action is in the public interest, accept other than the lowest offer, and waive informalities and minor irregularities in offers received.

(capitalization in original).

[15] As discussed above, the specific actions that resulted in Alpha Omega's disqualification from the RFQ were several instances of "Read-only" activity within the AWS Account after the Coding Challenge closed on March 17, 2026 by two Alpha Omega employees, Mr. Jacob Bilbro and Mr. Tom Jackson. Protestor characterizes Mr. Bilbro's and Mr. Jackson's activity within the AWS Account after the Coding Challenge closed as "routine, largely automated, and required governance audits that were read-only and did not alter or impact the coding challenge solution in any way[.]" (alteration added).

In defendant's initial brief, defendant argues that "[t]here is no indication in the RFQ language that an offeror's non-compliance with the prohibition on 'accessing the AWS account' could be waived at the discretion of USCIS; rather, the RFQ language demonstrates the requirement is material and as such non-waivable." (alteration added). In support, defendant asserts that "it is obvious that the requirement at issue was an express provision of the solicitation" and "the requirement plainly serves a substantive purpose: to protect the integrity of the evaluation, particularly the subsequent technical demonstration." Defendant further argues that FAR 52.212-1, which protestor relies on for its waiver argument, "permits the Government to waive 'informalities and minor irregularities'" but "does not allow USCIS to waive a material solicitation requirement."

In its response brief, protestor argues that defendant's "position depends on an unexplored assumption on Defendant's part that materiality is a question solely of the importance of the Solicitation term that was allegedly violated and that no consideration is to be given to whether the offeror's conduct constituted a material violation of the requirement." (emphases in original). Protestor continues:

> FAR 14.405's definition of minor informalities and irregularities—which has been adopted more broadly by the Federal Circuit—focuses on the materiality of the non-compliance and makes clear that even material solicitation terms (like the requirement to sign a bid so as to bind the company) can be waived as informalities and minor irregularities if circumstances exist that make the non-compliance immaterial.[16]

(footnote added). According to defendant, however, "Alpha Omega's read would have FAR 14.405 swallow up the entirety of FAR 52.212-1," but "the Federal Circuit's analysis does not divorce materiality from the solicitation's requirements in the manner Alpha Omega suggests." Defendant also argues in its response brief:

> Alpha Omega is asking the Court to impermissibly "look beyond the solicitation's language to extrinsic evidence" to determine whether the

---

[16] FAR 14.405 states in part:

> A minor informality or irregularity is one that is merely a matter of form and not of substance. It also pertains to some immaterial defect in a bid or variation of a bid from the exact requirements of the invitation that can be corrected or waived without being prejudicial to other bidders. The defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired. The contracting officer either shall give the bidder an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid or waive the deficiency, whichever is to the advantage of the Government.

48 C.F.R. § 14.405 (2026) (capitalization in original).

> solicitation's prohibition against "any . . . access to the AWS account" was material. Id. [Analysis, Stud., & Training Int'l, LLC v. United States, 175 Fed. Cl. 523, 532 (2025).] Alpha Omega's proposed individualistic determination of materiality would render the provision in question "material for one party and immaterial for another" and would "force this court to weigh how much alternative evidence" of non-harm is enough. Id. Therefore, the Court should reject Alpha Omega's arguments because the solicitation alone is all the Court must consider.

(omission in original; alteration added).

Regarding materiality, the United States Court of Appeals for the Federal Circuit has held that "'a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)). In Oak Grove Technologies, LLC v. United States, the United States Court of Appeals for the Federal Circuit elaborated:

> A proposal's failure to conform to a term or condition of a solicitation renders the proposal unawardable only if the violation relates to a term or condition that is material. See E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996) ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."). A "defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired." 48 C.F.R. § 14.405.

Oak Grove Techs., LLC v. United States, 116 F.4th 1364, 1379 (Fed. Cir. 2024) (alteration in original); see also ITellect, LLC v. United States, 173 Fed. Cl. 550, 562 (2024); FYI-For Your Info., Inc. v. United States, No. 26-32C, 2026 WL 2681160, at *20 (Fed. Cl. Aug. 24, 2026). A Judge of the United States Court of Federal Claims also has explained:

> Any deviating proposal "should be considered unacceptable and a contract award based on such an unacceptable proposal [would] violate[ ] the procurement statute and regulations." Id. [Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1329.] In other words, a proposal must adequately respond to material requirements in the solicitation. See Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037-38 (Fed. Cir. 2009) ("To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals.").

> A material solicitation requirement (1) is express in the solicitation, and (2) serves a "substantive purpose." Digiflight, Inc. v. United States, 150 Fed. Cl. 650, 657 (2020) (internal citations omitted), appeal dismissed, No. 2021-1486, 2021 WL 6337494 (Fed. Cir. Sept. 22, 2021). "A substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. 493, 506-07 (2019) (collecting cases). This Court has held that "[a] proposal's failure to satisfy a material . . . solicitation requirement is a material error." Digiflight, Inc., 150 Fed. Cl. at 657.

Thalin, LLC v. United States, 166 Fed. Cl. 246, 255-56 (2023) (third alteration added; other alterations and omission in original); see also ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. 493, 508 (2019). In DigiFlight, another Judge of the United States Court of Federal Claims explained:

> A material solicitation requirement is one that (1) is express in the solicitation, and (2) serves a "substantive purpose." ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. 493, 506 (2019) (citing Bus. Integra, Inc. v. United States, 116 Fed. Cl. 328, 333 (2014)). This Court has further defined "substantive purpose" to mean something that is "important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." Id. [ManTech Advanced Sys. Int'l, Inc. v. United States, 141] at 506–07 (citing Bus. Integra, Inc., 116 Fed. Cl. at 333, ST Net, Inc. v. United States, 112 Fed. Cl. 99, 106–110 (2013), Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 505 (2009), and Furniture by Thurston v. United States, 103 Fed. Cl. 505, 518 (2012)). Moreover, to the extent that Federal Circuit case law has yet to recognize this explicitly, this Court holds that so-called "mandatory minimum requirements" are always – and by definition constitute – material solicitation requirements. That is so because a mandatory minimum requirement is one "that a proposal must meet . . . in order to be eligible for evaluation or, conversely, that failure to comply with . . . will lead to outright rejection of the proposal." ManTech Telecommunications & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 67 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002). A proposal's failure to satisfy a material, or mandatory minimum, solicitation requirement is a material error.

DigiFlight, Inc. v. United States, 150 Fed. Cl. 650, 657 (2020) (alteration added; omissions in original), appeal dismissed, No. 2021-1486, 2021 WL 6337494 (Fed. Cir. Sept. 22, 2021); see also Revelations Counseling & Consulting, LLC v. United States, 180 Fed. Cl. 721, 734 (2026) ("Mandatory minimum requirements are per se material. . . . In other words, when a solicitation expressly hinges the acceptance or rejection of a proposal on whether it adheres to a particular requirement, that requirement is, by definition, material." (omission added)); Analysis, Stud., & Training Int'l, LLC v. United States, 175 Fed. Cl.

523, 533 (2025) ("[A] term is material when the solicitation says that noncompliance with the term is a basis for exclusion." (alteration added)); WaveLink, Inc. v. United States, 154 Fed. Cl. 245, 273 (2021) ("Moreover, when a solicitation provision uses mandatory language that is clear and unambiguous, '[t]he dispositive issue is not whether [the offeror's] proposal was reasonable, but whether it complied with the mandatory requirements of the solicitation.'" (alterations and emphasis in original) (citing Beta Analytics Int'l, Inc. v. United States, 44 Fed. Cl. 131, 139 (1999))).

Moreover, another Judge of the United States Court of Federal Claims has stated: "It is undisputed that an agency 'may only accept an offer that conforms to the material terms of the solicitation.'" Elevated Techs., Inc. v. United States, 160 Fed. Cl. 257, 270 (2022) (quoting Furniture by Thurston v. United States, 103 Fed. Cl. 505, 518 (2012)). The Judge in Elevated Technologies continued:

> A response that fails to conform to the material terms of a solicitation "should be considered unacceptable" because "a contract award based on such a proposal violates the procurement statutes and regulations." Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)); ITT Fed. Servs. Corp. v. United States, 45 Fed. Cl. 174, 194 (1999) ("Generally, the case law provides that a contract award may not be upheld when the [agency] improperly departs from stated evaluation criteria in a solicitation.").

Elevated Techs., Inc. v. United States, 160 Fed. Cl. at 270 (alteration in original). In addition, the same Judge of the United States Court of Federal Claims who decided Thalin, discussed above, also stated in Bionetics Corp. v. United States:

> "[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable[.]" E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996). Terms are material when they (1) are express in the solicitation and (2) serve a substantive purpose. ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. 493, 506 (2019). "A substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." Id. at 506–07 (collecting cases). This Court has previously held that "socalled [sic] 'mandatory minimum requirements' are always—and by definition constitute—material solicitation requirements." DigiFlight, Inc. v. United States, 150 Fed. Cl. 650, 657 (2020), appeal dismissed, No. 2021-1486, 2021 WL 6337494 (Fed. Cir. Sept. 22, 2021). "A proposal's failure to satisfy a material, or mandatory minimum, solicitation requirement is a material error." Id.

Bionetics Corp. v. United States, 159 Fed. Cl. 834, 842 (2022) (third alteration added; other alterations in original).

With respect to materiality, protestor argues that "the critical question in this case" is "whether the [sic] AOI's specific actions constituted a material non-compliance with the Solicitation," (alteration added), and protestor states that "the Agency examined whether the 'non-compliance' was material, concluded that it was, and decided not to waive the 'non-compliance' for that reason." Protestor is wrong on the facts and the law. First, although protestor argues that "the prevailing sentiment of the disqualification memorandum is that the prohibition on 'accessing the AWS account' was waivable," the court notes that the May 15, 2026 Memorandum to File explicitly found that "Alpha Omega is non-compliant with material RFQ requirements and therefore excluded from participating in the Factor 3 Technical Demonstration." (emphasis added). Significantly, although the FAR provision included in the RFQ, FAR 52.212-1(d), permits the agency to "waive informalities and minor irregularities in offers received," the question of materiality focuses first on the language of the solicitation, not on the protestor's alleged non-compliance. See, e.g., Oak Grove Techs., LLC v. United States, 116 F.4th at 1379 ("A proposal's failure to conform to a term or condition of a solicitation renders the proposal unawardable only if the violation relates to a term or condition that is material." (emphasis added)); WaveLink, Inc. v. United States, 154 Fed. Cl. at 273. In the above captioned bid protest, the court agrees with the agency's determination that the RFQ's prohibition on "accessing the AWS account" is a material solicitation requirement because (1) it is expressly stated in paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, and (2) it serves a "substantive purpose." See DigiFlight, Inc. v. United States, 150 Fed. Cl. at 657; see also Thalin, LLC v. United States, 166 Fed. Cl. 246. Paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, serves a substantive purpose because it is important to the government's evaluation of quotations received by ensuring that offerors who were selected to participate in the Technical Demonstration phase would compete on a level playing field. See ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 506 ("A substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid."). According to the May 15, 2026 Memorandum to File, "[w]hile the intent of RFQ Section 4.2.8, Factor 2, Coding Challenge – Part B), Instructions, paragraph C. was to preserve the integrity of the submission and evaluation process, it was also intended to ensure fairness amongst all Quoters." (capitalization in original; alteration added). That paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, explicitly states that non-compliance "will result in the disqualification of the Quoter" further demonstrates that paragraph 4.2.8(C) of the RFQ, as amended, is a material solicitation requirement. See Revelations Counseling & Consulting, LLC v. United States, 180 Fed. Cl. at 734 ("[W]hen a solicitation expressly hinges the acceptance or rejection of a proposal on whether it adheres to a particular requirement, that requirement is, by definition, material." (alteration added)). Therefore, paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, is a material solicitation requirement that cannot be waived by the agency. See Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1329.

Having determined that paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, is a material, nonwaivable, solicitation requirement, which categorically prohibits any "access to the AWS account" after the Coding Challenge closed on March 17, 2026, including "Read-only access," the court turns to protestor's multiple, sequential motions to supplement the Administrative Record. The United States Supreme Court has held that when "reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." Dep't of Com. v. N.Y., 588 U.S. 752, 780 (2019) (citing Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 549 (1978) (calling the United States Supreme Court's establishment of the principle that agency action must be reviewed in light of the existing administrative record "abundantly clear"); and Camp v. Pitts, 411 U.S. 138, 142-43 (1973)). The United States Court of Appeals for the Federal Circuit in Axiom Resource Management, Inc. v. United States, 564 F.3d 1374 (Fed. Cir. 2009), articulated the following test for supplementing the administrative record:

> The focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA [Administrative Procedure Act]. Faced with the request to supplement the administrative record in this case, the Court of Federal Claims should have determined whether supplementation of the record was necessary in order not "to frustrate effective judicial review."

Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (alteration added) (quoting Camp v. Pitts, 411 U.S. at 142-43). The Federal Circuit in Axiom also characterized the test as "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1380 (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)); see also Kayhan Space Corp. v. United States, 181 Fed. Cl. 659, 692 (2026); Insight Pub. Sector, Inc. v. United States, 157 Fed. Cl. 398, 406 (2021). As explained by another Judge of the United States Court of Federal Claims:

> Supplementation of the administrative record "should be limited to cases in which the omission of extra-record evidence precludes effective judicial review," id. [Axiom Res. Mgmt., Inc. v. United States, 564 F.3d] at 1380 (cleaned up), because "the focal point for judicial review [under the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court."

Aery Aviation, LLC v. United States, 179 Fed. Cl. 392, 407 (2025) (first alteration added; second alteration in original) (quoting Camp v. Pitts, 411 U.S. at 142). As described by another Judge of the United States Court of Federal Claims: "The administrative record in an APA case (or, as here, a case applying APA review) consists of 'all documents and materials that the agency directly or indirectly considered.'" CAN Softtech, Inc. v. United States, 173 Fed. Cl. 480, 485, recons. denied, 174 Fed. Cl. 412 (2024) (quoting Safari

Club Int'l v. Jewell, 111 F. Supp. 3d 1, 4 (D.D.C. 2015)); see also Cubic Applications, Inc. v. United States, 37 Fed. Cl. 339, 342 (1997) ("The court's inquiry is therefore based on an examination of the 'whole record' before the agency; that is, all the material that was developed and considered by the agency in making its decision." (citing Camp v. Pitts, 411 U.S. at 142)).

As indicated above, protestor has filed two, sequential motions to supplement the Administrative Record in the above captioned bid protest. In protestor's first, September 22, 2026 motion to supplement the Administrative Record, protestor seeks to supplement the Administrative Record with (1) screenshots of the AWS Account at issue in the above captioned bid protest, (2) a video that records Mr. Bilbro logging into and navigating a different AWS account,[17] and (3) an accompanying declaration from Mr. Bilbro explaining the video. In protestor's second, September 24, 2026 motion to supplement the Administrative Record, protestor seeks to supplement the Administrative Record with (1) protestor's incumbent, current ODOS task order and the modifications thereto, and (2) the CIO-SP3 IDIQ contract under which protestor's current ODOS task order was issued.

In protestor's brief in response to the court's September 30, 2026 Order, protestor explains its intended purpose for protestor's multiple, sequential motions to supplement the Administrative Record as follows:

> AOI seeks (a) completion or supplementation of the Administrative Record with screenshots of the AWS Account and (b) supplementation with a Video and Declaration of Mr. Bilbro navigating in a separate AWS account. These materials show visually what limited information appears in an AWS account when logging in and what information was visible when Mr. Bilbro navigated to "user"-related pages to check security. The Video also shows that the CloudTrail logs would have shown different log events if Mr. Bilbro had navigated to services within the AWS Account that would give AOI more detailed information. The contract documents regarding the incumbent ODOS task order demonstrate cybersecurity requirements that AOI is subject to. These materials speak directly to the questions of whether AOI had a valid reason to log into the AWS Account and whether [sic] observed the Agency's evaluation activities and accessed other competitively useful information, as the Agency claimed in determining that AOI's actions were prejudicial to other quoters.

(capitalization and emphasis in original; alteration added). As the court already has determined above, however, the plain meaning of paragraph 4.2.8(C) of the RFQ, as

---

[17] As indicated above, in protestor's September 22, 2026 motion to supplement the Administrative Record, protestor states that the video records Mr. Bilbro logging into and navigating "an account in the AWS environment that is separate from the AWS Account at the heart of the dispute in this case (the 'Separate Account')." The court questions why protestor would attempt to supplement the Administrative Record with a video involving an AWS account that is separate and distinct from the AWS Account at issue in Alpha Omega's bid protest.

amended by Amendment 0004, clearly prohibits, without exception, any access to the AWS Account of whatever kind after the Coding Challenge closed on March 17, 2026. The plain language of the RFQ did not limit the prohibition on "accessing the AWS account" merely to access that could result in obtaining competitively useful information or otherwise limit the prohibition on "accessing the AWS account" to a particular type of access. The RFQ does not include any qualifying language regarding the prohibition on "accessing the AWS account" that would require the court to consider, as protestor suggests, the context under which the Alpha Omega employees accessed the AWS Account after the Coding Challenge closed on March 17, 2026. Nor does the RFQ include any qualifying language regarding the prohibition on "accessing the AWS account" that would require the court to consider the "cybersecurity requirements that AOI is subject to" under protestor's incumbent, current ODOS task order and the underlying CIO-SP3 IDIQ contract. Protestor's incumbent, current ODOS task order and the underlying CIO-SP3 IDIQ contract preexisted the issuance of the RFQ at issue in Alpha Omega's bid protest and do not appear to be relevant to the interpretation of the plain language of the RFQ at issue in Alpha Omega's bid protest. Moreover, as indicated above, paragraph 4.2.8(C) of the RFQ, as amended by Amendment 0004, is a material solicitation requirement that cannot be waived by the agency. Therefore, the court finds that the materials protestor seeks to supplement and make part of the Administrative Record, which, according to protestor, "speak directly to the questions of whether AOI had a valid reason to log into the AWS Account and whether [sic] observed the Agency's evaluation activities and accessed other competitively useful information," (alteration added), are unnecessary for effective judicial review in the above captioned bid protest. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1380 ("[S]upplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" (alteration added) (quoting Murakami v. United States, 46 Fed. Cl. at 735)). For the foregoing reasons, protestor's first, September 22, 2026 motion to supplement the Administrative Record with (1) screenshots of the AWS Account at issue in the above captioned bid protest, (2) a video that records Mr. Bilbro logging into and navigating a different AWS account, and (3) an accompanying declaration from Mr. Bilbro explaining the video, is **DENIED**. In addition, for the same reasons, protestor's second, September 24, 2026 motion to supplement the Administrative Record with (1) protestor's incumbent, current ODOS task order and the modifications thereto, and (2) the CIO-SP3 IDIQ contract under which protestor's current ODOS task order was issued, also is **DENIED**.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**